IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KRYSTAL DAWN ALI,

                    Plaintiff,

        v.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL SECURITY

               Defendant.

Civil Action No. 1:22-CV-00780

---

## **MEMORANDUM ORDER**

    Plaintiff Krystal Ali ("Plaintiff" or "Ms. Ali") appeals from an unfavorable decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability insurance benefits and supplemental security income. D.I. 1. The parties' cross-motions for summary judgment are pending before the Court. D.I. 17, D.I. 25. Upon review of the Commissioner's final decision denying Plaintiff's claim, the Court finds that the Commissioner's findings are supported by substantial evidence and, accordingly, affirms.

## I.    BACKGROUND

### A. **Procedural History**

    Plaintiff filed an application for Disability Insurance Benefits and Supplemental Security Income on March 31, 2020, alleging disability under sections 216(i) and 223(d) of the Social Security Act. D.I. 13, Ex. 1D. Plaintiff's claims were denied initially and on reconsideration. *Id.* at 106, 111-113. Upon request by Plaintiff, an administrative law judge ("ALJ") held a hearing on June 10, 2021. *Id.* at 20. Shortly thereafter, on July 29, 2021, the ALJ issued a decision unfavorable to Plaintiff, finding instead that Plaintiff had capacity to perform a range of

light and sedentary work. *Id.* at 24. The Appeals Council subsequently denied Plaintiff's request for review on April 20, 2022. *Id.* at 5.

On June 20, 2020, Plaintiff filed this action challenging the ALJ's unfavorable decision. D.I. 1. Subsequently, Plaintiff filed a motion for summary judgement on November 28, 2022, D.I. 17, and the Commissioner responded with a cross-motion for summary judgment on March 01, 2023. D.I. 25.

## B. Medical History

Plaintiff Krystal Ali was 39 years old on the onset of her alleged disability date in February 2020. D.I. 13 at 70. Ms. Ali has an extensive history of chronic urinary tract infections and chronic kidney disease. The Court summarizes the medical evidence on the records that are most relevant to Plaintiff's appeal of the ALJ's decision.

### i. Medical Evidence

For many years, Ms. Ali has suffered from numerous impairments, including chronic kidney disease, nephrolithiasis (kidney stones), nephrocalcinosis, endometriosis, ovarian cysts, and thoracic degenerative disc disease. Ex. 4F at 18-19. The record also shows that Ms. Ali suffers from frequent urinary tract infections (UTIs) and other genealogical issues. *Id.* In June 2020, Ms. Ali was diagnosed with colitis, after a CT of Ms. Ali's colon revealed signs of inflammation. *Id.*

Plaintiff contends that Ms. Ali's ailments at times cause Ms. Ali to suffer pain and other symptoms, including vomiting, nausea, urinary frequency, fatigue, and diarrhea. *See id.* at 8, 19. From 2020 through 2021, Ms. Ali visited the emergency room repeatedly. *See generally* Ex. 1F.

2

These emergency room visits included: (1) A six-day hospital stay in February 2020 for pancolitis (Ex. 1F at 85-87); (2) A two-day hospital stay in March 2020 for nephrocalcinosis (*Id.* at 15-23); (3) A one-day hospital visit in April 2020 for kidney stones (Ex. 4F at 70-71); (4) A one-day hospital visit in June 2020 for acute pyelonephritis (*Id.* at 60-61); and (5) A one-day hospital visit in Jul 2020 for a possible hemorrhagic cyst (*Id.* at 30-34). The ALJ found that many of the visits resulted after Ms. Ali ran out of pain medication. In September 2020, for instance, Ms. Ali had two emergency room visits for pain and nausea caused by kidney stones. *Id.* at 7, 17. During each visit, Ms. Ali was prescribed a limited supply of medication to resolve the pain and was instructed to follow-up with a pain management specialist and a urologist. *Id.* at 15-16, 25-25.

Ms. Ali was again seen in the emergency room in January 2021, reporting that she once more had run out of pain medication. Ex. 1F at 88-93. In February 2021, Ms. Ali visited the emergency room again for nausea and abdominal pain and was found to have positive urine toxicology screen for cocaine and opiates. *Id.* at 38-50. Ms. Ali returned to the emergency room in March 2020 citing right side flank pain. *Id.* at 15-26. Ms. Ali returned once more in April 2020 with chronic urinary pressure, back pain, nausea, and vomiting. *Id.* at 70. A CT of Ms. Ali's abdomen showed "[u]nchanged bilateral nonobstructing renal calculi without evidence ureteral or bladder calculus [and] [n]o hydroureteronephrosis." *Id.* at 76. During this April emergency room visit, Ms. Ali indicated that she no longer intended to seek the assistance of a pain management expert and would not take pain medication daily because she did not have daily pain. *Id.* at 87.

3

In addition to the above, Ms. Ali underwent ovarian surgery in July 2020 and two stent procedures in October 2020. *Id.* at 35; Ex. 8F at 12-14. Ms. Ali treated with a urologist, Gregory Spana, M.D.; primary care physician, Blanca Ocampo-Lim, M.D.; and Svastijaya Daviratanasilpa, nephrologist. Ex. 1F at 6. Ms. Ali testified that she planned to see a gastroenterologist for her recent colitis diagnosis in August 2021. D.I. 13 at 49.

### ii. **Dr. Daviratanasilpa's Report**

The record contains two treatment notes from Ms. Ali's nephrologist, Dr. Daviratanasilpa. The first is a treatment note from May 2020, made pursuant to a tele-health visit and noting Ms. Ali's a history of multiple renal calculi "primarily due to low urine volume." Ex. 6F at 1-2. The second treatment note is from an in-person visit on April 8, 2021. *Id.* at 4. In this latter note, Dr. Daviratanasilpa observed that Ms. Ali's 24-hour urine study showed no improvement and that Ms. Ali had "very high supersaturation of calcium oxalate without improvement in the past 3 years." *Id.* at 6-8. Dr. Daviratanasilpa added that he "continue[d] to encourage fluid intake and compliance with medication" but otherwise noted that Ms. Ali's exams were normal, and Dr. Daviratanasilpa found no deficits related to her abdomen, peripheral vascular, and neurologic systems. *Id.* at 7-8.

Subsequently, in a report dated June 3, 2021, Dr. Daviratanasilpa opined that Ms. Ali would be unable to work on a regular and continuing basis due to her bilateral nephrocalcinosis and recurrent renal calculi. *See generally* Ex. 5F. Dr. Daviratanasilpa similarly noted that Ms. Ali was non-compliant with her treatment and continued to show low urine output results through urine collection testing. *Id.* at 4. According to Dr. Daviratanasilpa, some of Ms. Ali's symptoms were caused or exacerbated by Ms. Ali's non-compliance. *Id.*

4

### iii.  State Agency Opinions

On August 12, 2020, Darrin Campo, M.D., a State agency medical consultant, submitted an opinion, finding that Ms. Ali suffered from severe medical impairments from chronic kidney disease, congenital anomalies of the urinary system, and gynecological disorders.  Ex. 2A, 4A. Still, Dr. Campo found that Ms. Ali could undertake work at a light level of exertion with frequent climbing of ramps and stairs, occasional climbing ladders, ropes, or scaffolds, frequently balance, stoop, kneel, crouch, and crawl, and avoid concentrated exposure to hazards. *Id.*  On November 10, 2020, Dr. Campo's opinions were affirmed by another State agency medical consultant, Joseph Michel, M.D.  Ex. 6A, 8A.

## C.  Hearing Before the ALJ

### i.  Testimony from Plaintiff

At the hearing before the ALJ on June 10, 2021, Plaintiff's counsel testified that Ms. Ali suffers from numerous renal and GI issues and has repeated issues with kidney stones that cause Ms. Ali significant pain and often result in hospitalization.  D.I. 13 at 39-42.  Counsel also noted that Ms. Ali suffers from endometriosis, ulcerative pancolitis, and inflammation of the colon and, as a result of her many diagnoses, Ms. Ali should be granted full disability.  *Id.*

The ALJ asked Ms. Ali questions about her prior work experience.  Ms. Ali testified that she left her last employer, Family Dollar, in February 2020 and, since then, has been unemployed.  *Id.* at 43-44.  Ms. Ali also testified that, prior to working at Family Dollar, she worked as a cashier and stock at Harbor Freight where she "lifted merchandise [], rang up sales, displays on stock floor, emptied the truck for shipments, and had to lift 100 pounds or more," and before then, as a cashier at Royal Farms, where she similarly "rang up customers, cleaned

the area around [her], stocked coolers and merchandise, stood eight hours, and lifted up to 50 pounds." *Id.* at 44-45.

When asked why she was now unable to work, Ms. Ali testified to experiencing back pain "on a constant basis" due to kidney stones. *Id.* at 46-47. Ms. Ali further noted that she passes kidney stones daily and suffers other symptoms from the pressure caused by the stones. *Id.* To relieve some of her pain and discomfort, Ms. Ali explained that she has undergone two lithotripsy surgeries with her urologist, Dr. Spana, to break down kidney stones. *Id.* Ms. Ali also noted that she was taking new medication proscribed by her nephrologist, Dr. Daviratanasilpa, and was adopting a new diet that could slow down the rate at which some of her stones became calcified. *Id.*

The ALJ asked Ms. Ali to explain some concerns noted in Dr. Daviratanasilpa's report regarding her failure to comply with her treatment plan. *Id.* at 47. Ms. Ali explained that a urine collection ordered by Dr. Daviratanasilpa was lost and delayed in the mail and, as a consequence, the results of the urine collection were inaccurate. *Id.* The ALJ asked Ms. Ali to explain whether she followed the suggestions of emergency room staff that she work with a pain management specialist. *Id.* at 48. Ms. Ali explained that she had not pursued the assistance of a pain management specialist because she did not want to rely on pain medication "just to get through the day" and could go some days completely without pain medication. *Id.*

Regarding Ms. Ali's colitis diagnosis, the ALJ asked whether Ms. Ali had met with any specialists since her diagnosis in February 2020. *Id.* at 49. Ms. Ali noted that she hadn't met with a specialist but had an upcoming appointment with a gastroenterologist in August 2021. *Id.* at 49-50. The ALJ asked Ms. Ali about her flare-ups, noting that hospital records did not show

6

that she had any colon flare-ups through the end of the year. *Id.* Ms. Ali explained that she had one flare-up in February 2020, at the time of her diagnosis, and believed that she had another several months later, in April 2021. *Id.*

As to her daily routine, Ms. Ali explained that she spends most of her day laying on the couch in the fetal position. *Id.* at 50-54. Ms. Ali testified that she cannot carry more than five pounds and is unable to assist with most household chores. *Id.* Ms. Ali noted that her fiancé and eldest son assist with most household chores, including cooking, cleaning, and shopping for necessities. *Id.* Ms. Ali also testified that she has trouble sleeping through the night and is unable to sit in one position long enough to drive. *Id.* Ms. Ali explained that pain medication helps with some of her symptoms but often causes her drowsiness, fatigue, and, at times, nausea, and loss of appetite. *Id.* at 56.

### ii. **Testimony from Vocational Expert**

The ALJ asked the vocational expert ("VE"), Adina Levington, to assume a hypothetical individual of Ms. Ali's age, education, and past work experience; to assume that the hypothetical individual was limited to a range of light work, except for climbing ropes, ladders, or scaffolds, using dangerous moving machinery, or being exposed to unprotected heights; to assume that the individual could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and to assume that the individual could occasionally be exposed to vibration, extreme heat, extreme cold, or other extreme weather. *Id.* at 58.

The VE noted that such a hypothetical person would be able to perform Ms. Ali's past relevant work. *Id.* at 58-59. The VE explained that the hypothetical person could also perform other employment at the light exertion and sedentary exertion levels, including as a router,

general office helper, mail clerk, and clerk for food and beverage. *Id.* at 59-61. According to the VE, these positions would be possible even if the individual alternated his or her position between sitting and standing throughout the day. *Id.*

In response to questions from Ms. Ali's counsel, the VE testified that the hypothetical individual may face problems if the individual was required to miss eight days of work a year, but generally will not face issues unless he is missing twelve or more days. *Id.* at 61-62. Additionally, the VE noted that the hypothetical employee may draw his supervisor's attention if he takes an unscheduled bathroom break of less than 10 minutes each hour, but the breaks would likely become work preclusive if they lasted for 10 minutes or more. *Id.* at 62.

### D. The ALJ's Findings

Based on the medical evidence in the record and the testimony by Plaintiff and the VE, the ALJ determined that Ms. Ali was not disabled under the Act for the relevant time period from her February 12, 2020 disability onset date through the date of the ALJ's written decision on July 29, 2021. *Id.* at 13-26. The ALJ found, in pertinent part that:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024;

2. The claimant has not engaged in substantial gainful activity since February 12, 2020, the alleged onset date;

3. The claimant has the following severe impairments: chronic kidney disease, nephrocalcinosis, endometriosis, and ovarian cyst;

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she cannot be exposed to hazards defined

8

as climbing ropes, ladders, or scaffolds; using dangerous moving machinery; or being exposed to unprotected heights. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl as defined by the SCO. The claimant can occasionally push or pull with all extremities. The claimant can occasionally be exposed to vibration, extreme heat, extreme cold, wetness, humidity extremes, fumes, odors, dust, gases, or poor ventilation.;

6.  The claimant is capable of performing past relevant work as a manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity; and

7.  The claimant has not been under a disability, as defined in the Social Security Act, from February 12, 2020, through the date of this decision.

*Id.*

## II.   STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision.  *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

9

## III.    DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program.  42 U.S.C. § 1382(a).  A disability is defined for purposes of SSI and DIB as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy.  *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).  The claimant has the burden of proving that he has a disability within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(5).

The Commissioner must perform a five-step analysis to determine whether a person is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i).  At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity.  *See id.* at §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, step two requires

10

the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* at §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to the fourth and fifth steps. *See id.* at §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* at §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she

11

is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

**B.  Plaintiff's Challenges to the Merits of the ALJ's Determination:**

On appeal, Plaintiff challenges the merits of the ALJ's determination on three general grounds: (1) that the ALJ failed to consider whether Plaintiff was disabled for any 12-month period; (2) that the ALJ improperly evaluated opinion testimony; and (3) that the ALJ's RFC determination was inherently defective. *See generally* D.I. 17 at 8-19. Each argument is addressed below.

**1.  Did the ALJ err by not considering whether Plaintiff was disabled for any 12-month period?**

Plaintiff contends that the ALJ erred in finding that Plaintiff had the capacity to perform light work. D.I. 17 at 10-12. According to Plaintiff, the ALJ failed to consider whether any 12-month period of disability existed. *Id.* The Court disagrees. While Plaintiff contends that the ALJ erred in not "determine[ing] whether there is *any* 12 month period from the time of onset through the date of decision when the claimant may have been disabled," it is "[t]he claimant," and not the ALJ, "[who] bears the initial burden of proving disability," and Plaintiff has not shown that a 12-month period existed. *Seney v. Colvin*, 982 F. Supp. 2d 345, 353 (D. Del. 2013), *aff'd sub nom. Seney v. Comm'r Soc. Sec.*, 585 F. App'x 805 (3d Cir. 2014).

Further, in assessing Plaintiff's claim, the ALJ analyzed Ms. Ali's records starting in February 2020, the alleged onset date of her disability. D.I. 13 at 20-22. Despite noting Ms. Ali's many hospital visits during that period, the ALJ found that Plaintiff's impairments did not meet or equal the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 because "the record does not document complications of chronic kidney disease

12

requiring at least three hospitalizations within a consecutive 12-month period and occurring at

least 30 days apart[]." *Id.* at 19. The ALJ's report reveals that the ALJ considered Ms. Ali's

hospitalization records through February 2021 and ultimately found that, while Ms. Ali "has had

a number of emergency room visits during the relevant period, a majority of the hospitalizations

were not due to complications of chronic kidney disease and did not last at least 48 hours." *Id.*

The Court finds the ALJ's determination is supported by substantial evidence.

Plaintiff also argues that the ALJ's assessment of Ms. Ali's hospitalization record failed

to account for the symptoms Ms. Ali experienced prior to her hospital visit and the time she

would need to recover after each visit. *Id.* at 11. Plaintiff notes that, when going to the hospital,

Ms. Ali symptoms generally included "not only pain, but vomiting, diarrhea, urinary issues, and

infections." *Id.* When viewed in light of the many symptoms Ms. Ali experienced, Plaintiff

contends that her hospitalization records illustrate that Ms. Ali would be unable to sustain work.

*Id.*

While Plaintiff alleges that the ALJ focused only on Ms. Ali's symptoms of pain, the

ALJ's report shows that the ALJ considered the other symptoms experienced Ms. Ali. The ALJ

notes, for instance, that Ms. Ali visited the emergency room on February 16, 2020 "with nausea

and vomiting for one day, dizziness, lightheadedness, and generalized abdominal pain." *Id.* at

21. The report again notes that Ms. Ali "was treated at the emergency room on June 6, 2020, for

periumbilical abdominal pain with onset of abdominal cramping, diarrhea, and vomiting" and

returned to the emergency once more with left sided flank pain for one day, nausea and vomiting

due to pain, and urinary frequency and urgency on September 25, 2020. *Id.* While the ALJ

found one hospital visit in which Ms. Ali "was found to have positive urine toxicology screen for

cocaine and opiates" and had "symptoms of vomiting and dry heaves . . . found to be associated with cocaine use," the ALJ determined, "[a]fter careful consideration of the evidence," that the symptoms reasonably could be caused by Ms. Ali's impairments. *Id.* at 22. Thus, the Court disagrees with Plaintiff's claim that the ALJ considered only Ms. Ali's symptoms of pain.

In finding that Ms. Ali's symptoms did not impair her ability to work, the ALJ made several key determinations based on the record. The ALJ found, for instance, that many of Ms. Ali's symptoms and hospital visits were not due to complications of chronic kidney disease. In support of this finding, the ALJ noted that Ms. Ali's symptoms improved after hospital staff administered pain medication. *Id.* at 23. The ALJ also noted that emergency room staff had consistently encouraged Ms. Ali to seek the assistance of a pain management specialist to help alleviate her symptoms, and Ms. Ali instead sought treatment at the emergency room. *Id.* The ALJ highlighted Ms. Ali's statements during one hospital visit where she noted that she "no longer wants to take pain medication daily because she does not have pain daily." *Id.* Thus, despite Plaintiff's claims otherwise, *see id.* at 11, this matter is distinguishable from *Nance v. Barnhart*, where the court found that the claimant's sporadic bouts of increased pain prevented her from engaging in substantial gainful activity. 194 F.Supp.2d 302 (D. Del. 2002). In describing the claimant's symptoms, the *Nance* court noted that claimant "still experienced sporadic bouts of increased pain" despite seeking aggressive treatment for her pain and undergoing surgery and therapy "as recommended by various physicians" and "described her pain as six on a one to ten scale on a normal day." *Id.* at 306. In fact, as noted below, the ALJ recognized several comments from medical providers that Ms. Ali's symptoms were caused, in part, by her poor compliance. D.I. 13 at 23; Ex. 5F at 4.

14

The ALJ noted, for instance, that Ms. Ali received "multiple recommendations from her urologist and nephrologist to increase fluid intake to target urine output of 2.5 L/day" and, despite these recommendations, "24-hour urine litholink performed on January 29, 2020 and February 16, 2021, continue to find urine output of less than 1 L/day," showing that Ms. Ali likely failed to comply.  D.I. 13 at 23.  The ALJ credited Dr. Daviratanasilpa's testimony that Ms. Ali's non-compliance was contributing to her failure to improve.  *Id.*  While Plaintiff contends that Dr. Daviratanasilpa's opinions on non-compliance were inconsistent with Ms. Ali's testimony, the ALJ was entitled to find that Ms. Ali's testimony contending that she was following Dr. Daviratanasilpa's recommendations was not credible, given other evidence in the record, including, as discussed above, Ms. Ali's failure to comply with other suggested treatments as well as numerous multi-level exams that returned normal results and hospital records that described Ms. Ali as "well-appearing."  *Id.*

In light of the above, the Court finds that the ALJ's determination is supported by substantial evidence.

### 2.  Did the ALJ err in evaluating opinion evidence?

According to Plaintiff, the ALJ cited medical opinions from the Agency's medical consultants and from Ms. Ali's treating nephrologist without addressing evidence that contradicted each opinion.  D.I. 17 at 12.  The Court considers each argument in more detail below.

### i.  Did the ALJ err in evaluating the opinions of the two State agency medical consultants?

Plaintiff contends that the ALJ accepted two opinions from the two State agency medical consultants without addressing evidence that contradicts the opinions.  *Id.* at 12-13.  Specifically,

15

Plaintiff argues that the last opinion from Dr. Michel was authored in November 2020, over a year before the ALJ's decision in July 2021. *Id.* Thus, Plaintiff contends that the medical consultants made their determination without viewing "crucial evidence." *Id.* For instance, Plaintiff notes that the medical consultants "never reviewed the opinion from a long-term specialist . . . that illustrated the symptoms from just Ms. Ali's kidney impairments" and how those impairments are work preclusive. *Id.* Plaintiff contends that the ALJ erred in adopting the opinions of the medical consultants without even addressing the possibility that each opinion was outdated. *Id.*

This argument is unavailing, however, "because state agency review precedes ALJ review, [and] there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Further, disability regulations only require an updated report "where 'additional medical evidence is received that *in the opinion of the [ALJ]* ... may change the State agency medical ... consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing.'" *Id.* (emphasis in original) (internal citations omitted). Yet, Plaintiff is not arguing that additional evidence received after the medical consultants' reports would have changed the ALJ's opinions. Instead, Plaintiff argues that the ALJ committed reversable error by failing to address the age of the medical consultants' reports in finding that the medical consultants' reports were persuasive. D.I. 17 at 12-13. Thus, the Court finds that an updated report was not required.

Plaintiff's claim that the medical consultants "never reviewed the opinion for a long-term specialist that illustrated the symptoms from just Ms. Ali's kidney impairments" is also of no avail because "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations," and the ALJ here did review the report from Dr. Daviratanasilpa, the "long-term specialist," before making its determination. *See Chandler*, 667 F.3d at 361.

Further, in adopting the opinions of the medical consultants, the ALJ "did not merely rubber stamp [the consultants'] conclusion[s]." *Id.* Rather, the ALJ found that the opinions were "consistent with exam findings of intermittent flank and abdominal pain and occasional emergency room visits for treatment." D.I. at 22-23 ("As of April 28, 2021, she had a normal abdomen exam, normal chest exam, normal peripheral vascular exam, and normal neurologic exam."). Thus, the ALJ did not err in evaluating the opinions of the two State agency medical consultants.

### ii.   Did the ALJ err in evaluating the opinions of Dr. Daviratanasilpa?

Plaintiff also contends that the ALJ erred in adopting certain opinions from Ms. Ali's treating kidney specialist, Dr. Daviratanasilpa, regarding Ms. Ali's failure to comply with her treatment plan. D.I. 17 at 13. According to Plaintiff, Dr. Daviratanasilpa's opinions finding that Ms. Ali was non-compliant were contradicted by Ms. Ali's own testimony. *Id.* Specifically, Plaintiff contends that Dr. Daviratanasilpa relied on the results of 24-hour urine tests in finding that Ms. Ali failed to follow instructions that she increase her fluid intake. *Id.* at 13-14. Plaintiff argues that the test results were unreliable, however, given Ms. Ali's undisputed testimony "that her 24-hour urine test was lost in transit" and was "very late arriving at the laboratory." *Id.*

17

Plaintiff contends that the ALJ adopted Dr. Daviratanasilpa's opinions regarding Ms. Ali's non-compliance without addressing Ms. Ali's contrary testimony. *Id.*

Here, again, Plaintiff's challenge to the ALJ's reliance on Dr. Daviratanasilpa's non-compliance opinions are unavailing because the ALJ did not merely "rubber stamp" Dr. Daviratanasilpa's opinions. Rather, the ALJ relied on other evidence in the record, including comments from ER personnel instructing Ms. Ali to seek treatment from a pain management specialist and Ms. Ali's own testimony that she did not do so, to support Dr. Daviratanasilpa's claims that Ms. Ali was non-compliant. Because Dr. Daviratanasilpa non-compliance opinions were supported by other evidence in the record, the ALJ was entitled to adopt those opinions despite Ms. Ali's testimony contradicting their claims.

While Plaintiff argues that the ALJ erred in *adopting* Dr. Daviratanasilpa's non-compliance opinions, Plaintiff contends that the ALJ also erred by *rejecting* Dr. Daviratanasilpa's opinion that Ms. Ali is unable to sustain substantial employment. *Id.* at 14.

Plaintiff contends that this opinion was consistent with evidence in the record showing that Ms. Ali was present at the hospital on a monthly basis. *Id.* Dr. Daviratanasilpa's opinion was also supported, according to Plaintiff, by the medical examiners and the ALJ's own realizations that Ms. Ali's symptoms were cyclical. *Id.* Plaintiff argues that, despite this evidence, "the ALJ singularly determined that he could capture all of the work restriction stemming from the cyclical nature of Ms. Ali's symptoms by limiting Ms. Ali to occasional climbing ramps, crawling on the ground, and bending over along with never swinging rope." *Id.* at 14-15. Plaintiff contends that the ALJ erred both in rejecting Dr. Daviratanasilpa's opinions

18

regarding Ms. Ali's work restrictions and in employing the ALJ's own expertise in place of Dr. Daviratanasilpa's opinions. *Id.* The Court disagrees with Plaintiff on both points.

First, the ALJ did not err in rejecting Dr. Daviratanasilpa's opinions regarding Ms. Ali's work restrictions because the ALJ found that the opinions were contrary to Ms. Ali's records, including "[r]ecords from the emergency room describ[ing] the claimant as well-appearing, with unremarkable labs at times, and failing to follow through with pain management recommendations." D.I. 13 at 24. The ALJ also found Dr. Daviratanasilpa's opinion unpersuasive because Dr. Daviratanasilpa failed "to reveal findings that would explain a reduction in standing and walking, the need to shift positions at will, off task behavior, the need for unscheduled breaks, or absences at the degree specified." *Id.* While the ALJ "may not ignore consistent medical evidence showing disability in favor of their own opinion that there is no disabling impairment,"[1] "[t]he ALJ is not bound to accept the opinion or theory of any medical expert but may weigh the medical evidence and draw its own inferences." *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986). "Moreover, the ALJ should reject as insufficiently reasoned any medical opinion that reaches a conclusion contrary to objective clinical evidence without explanation." *Id.* Thus, having determined that Dr. Daviratanasilpa's opinions lacked explanation and were inconsistent with the record, the ALJ was entitled to find that the opinions were unreliable.

Second, in finding that Ms. Ali could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, the ALJ did not "employ its own expertise." *See* D.I. 17 at 14-15. Rather, the ALJ relied on the opinions of the two medical consultants who both concluded that

---

[1] *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989).

Ms. Ali had postural limitations that would limit her ability to climb rope, balance, kneel, crouch, or crawl. *See, e.g.*, Ex. 2A at 4. As noted above, the ALJ found that the consultants' opinions were supported by the record, including evidence from medical providers that Ms. Ali "was well-appearing on exam," had labs that "were unremarkable," and "no reproducible tenderness to palpitation."

Because the ALJ was entitled to rely on the opinions of the medical consultants, the Court finds no grounds to reverse the ALJ's determinations regarding Ms. Ali's work restrictions.

### 3.  Is the ALJ's RFC determination inherently defective?

Ultimately, the ALJ found that Ms. Ali had the residual functional capacity (RFC) to perform light work. D.I. 13 at 20-25. Plaintiff argues that this RFC determination is defective on several grounds.

Plaintiff contends, for instance, that the ALJ erred by making its finding "without following SSR 18-3p." D.I. 17 at 15-16. The Court disagrees. SSR 18-3p 'provide[s] guidance on how [SSA] appl[ies] our failure to follow prescribed treatment policy in disability ... claims under title II and XVI of the Social Security Act.'" *Marilyn G.D. v. Comm'r of Soc. Sec.*, No. CV 21-00494 (KM), 2022 WL 855684, at *8 (D.N.J. Mar. 22, 2022) (citing SSR 18-3p). In determining whether a claimant failed to follow prescribed treatment under SSR 18-3p, the ALJ must establish three conditions:

1. The Individual would otherwise be entitled to benefits based on disability or eligible for blindness benefits under titles II or XVI of the Act;

2. We have evidence that an individual's own medical source(s) prescribed[ ] treatment

for the medically determinable impairment(s) upon which the disability finding is based;

and

3. We have evidence that the individual did not follow the prescribed treatment.

*Id.* Here, however, the ALJ was not required to consider SSR 18-3p because the first condition

of the rule was not met. That is, the ALJ did not find that Ms. Ali would otherwise be entitled to

benefits based on disability. Rather, "the ALJ merely noted [Ms. Ali's] noncompliance with

prescribed treatments among other medical evidence in determining her RFC. *Marilyn G.D.*,

2022 WL 855684, at \*8. Accordingly, SSR 18-3p was not applicable. *Id.*

Plaintiff also contends that the ALJ erred by making its determination without discussing

the barriers to treatment Ms. Ali allegedly faced in receiving care, including "that her treatment

regimen was hampered due to the pandemic and her insurance issues." D.I. 17 at 17. Any error

caused by the ALJ's failure to consider Ms. Ali's alleged barriers to treatment, however, are

harmless, since "the ALJ gave other supported reasons to reject Plaintiff's [] claims" for

disability. *See Latoya B. v. Kijakazi*, No. 1:21-CV-03086-MKD, 2023 WL 1767770, at \*6 (E.D.

Wash. Jan. 23, 2023). For instance, Ms. Ali's own testimony that she did not intend to work

with a pain management specialist supported the ALJ's finding that Ms. Ali was non-compliant.

D.I. 13 at 48. In finding that Ms. Ali could perform light work, the ALJ also noted Ms. Ali's

past work experience and the fact that, "[a]s of April 28, 2021, [Ms. Ali] had a normal abdomen

exam, normal chest exam, normal peripheral vascular exam, and normal neurologic exam." *Id.*

at 22.

Plaintiff further argues that the ALJ failed to address the opinions made by Dr. Aepiln that contradicted Dr. Daviratanasilpa's non-compliance opinions.[2]   D.I. 17 at 17.   However, Dr. Aeplin provided opinions of laboratory results, but those opinions are not "medical opinions" "about what [the claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment" under the regulation.   D.I. 21, n. 3; 20 C.F.R. §§ 404.1513(a)(2) (defining "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions.").   Since Dr. Aepiln did not provide a "medical opinion," the ALJ did not err in failing to address Dr. Aepiln's report for purposes of determining Ms. Ali's RFC.   *See Dye v. Comm'r of Soc. Sec.*, No. 5:20-CV-459-NPM, 2022 WL 970186, at *4 (M.D. Fla. Mar. 31, 2022) ("None of the statements in Downey's letter assess the extent to which Dye can perform any particular function in a work setting, and so they do not constitute "medical opinions" for purposes of the applicable regulatory regime. . . [and] the ALJ was not required to assess anything in this letter for its persuasiveness or offer any reason for not finding its contents persuasive.").

Plaintiff next contends that the ALJ additionally failed "to include in his RFC days off to account for the exacerbation of Ms. Ali's symptoms," despite recognizing that Ms. Ali's symptoms were cyclical and recognizing her need for antibiotics and pain medications to be administered at the hospital.   D.I. 17 at 18.   While the ALJ found that Ms. Ali's symptoms were cyclical, the ALJ did not find that her symptoms required medication to be administered at a

---

[2] Dr. Aeplin's report, for instance, stated that Ms. Ali was never prescribed thiazide or potassium citrate, while Dr. Daviratanasilpa stated that he prescribed these medications to Ms. Ali to increase her urine citrates.

hospital.  Instead, the ALJ noted that Ms. Ali frequented the hospital, in part, because Ms. Ali

decided "to stop seeing a pain management specialist (4F/77), and instead has continued to seek

treatment at the emergency room."  D.I. 13 at 23.  Additionally, to the extent that Ms. Ali is

required to schedule recurring medical appointments, the Court agrees with Defendant that

nothing in the record indicates that those appointments could only occur during working hours.

D.I. 25 at 10; *see also Stull v. Saul*, No. 19-227, 2020 WL 5774895, at *1 n.1 (W.D. Pa. Sept. 28,

2020) ("Moreover, while the record undoubtedly shows that Plaintiff has attended a number of

appointments over the years, there is no indication in the record that each appointment requires

her to miss a full day of work.  Additionally, since the record does not show that such

appointments could not be scheduled outside of Plaintiff's prospective working hours, there is

also no indication that Plaintiff would necessarily have to miss partial days of work in order to

attend her appointments.").

      Finally, Plaintiff argues that the ALJ's RFC finding failed to account for Ms. Ali's need

for unscheduled bathroom breaks, despite finding that Ms. Ali has severe CKD and suffers from

frequent UTIs.  D.I. 17 at 19.  However, this did not result in reversable error because the ALJ

was entitled to agree with the State agency medical consultants who were aware of Plaintiff's

[CKD] and did not recommend an additional limitation to account" for future diarrhea, frequent

urination, and infections.  *Gaspero v. Kijakazi*, No. CV 22-86-MN-JLH, 2022 WL 17830246, at

*3 (D. Del. Dec. 21, 2022), *report and recommendation adopted*, No. CV 22-86 (MN) (JLH),

2023 WL 2734326 (D. Del. Mar. 31, 2023).  Further, as our courts have noted before, "there is

no requirement that an ALJ must, as a matter of law, include 'unscheduled breaks to use the rest

room' in the RFC" in cases like this one.  *Id.*  Thus, the Court is not persuaded by this argument.

For all of the above reasons, the Court finds that the ALJ's RFC determination is not inherently flawed.

## C. Adequacy of appointments of ALJ and Appeals Council Judges

In Plaintiff's final challenge to the ALJ's decision, Plaintiff argues that this matter should be remanded because the ALJ that heard Ms. Ali's claim was "not properly appointed by former Acting Commissioner Nancy Berryhill nor by any subsequent Commissioner or Acting Commissioner." D.I. 17 at 20. Plaintiff notes that Acting Commissioner Berryhill's tenure had expired under the Federal Vacancies Reform Act ("FVRA") when she ratified the ALJ's appointment in July 2018. *Id.* Thus, because the ALJ was not appointed by an agency head, Plaintiff contends, the appointment violated the Appointments Clause of the Constitution. *Id.* However, the overwhelming weight of authority addressing this issue, including courts in this circuit, have found that Ms. Berryhill was lawfully serving as Acting Commissioner when she ratified ALJ appointments in July 2018.[3] This Court is persuaded by their reasoning and therefore reject Plaintiff's argument.

---

[3] *See, e.g., Neale v. Kijakazi*, No. 21-915-SRF, 2022 WL 6111689, at *9 (D. Del. Oct. 7, 2022) (noting that, while "[i]t is undisputed that Berryhill held the position of Acting Commissioner for more than 210 days at the time Andrew Saul was nominated as Commissioner in April 2018," § 3346(a)(2) "contains a 'spring-back' provision that enabled [Berryhill] to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018"); *Reddick v. Kijakazi*, No. 21-1782, 2022 WL 16703903, at *17 (M.D. Pa. Oct. 7, 2022), *report and recommendation adopted*, 2022 WL 16700395 (M.D. Pa. Nov. 3, 2022); *Sidney M. v. Kijakazi*, No. C21-2034, 2022 WL 4482859, at *21 (N.D. Iowa Sept. 26, 2022); *Lance M. v. Kijakazi*, No. 21-628, 2022 WL 3009122, at *14 (E.D. Va. July 13, 2022), *report and recommendation adopted*, 2022 WL 3007588 (E.D. Va. July 28, 2022); *Williams v. Kijakazi*, No. 21-141, 2022 WL 2163008, at *4 (W.D.N.C. June 15, 2022); *Bauer v. Kijakazi*, No. 21-2008, 2022 WL 2918917, at *17 (N.D. Iowa July 25, 2022); *Thomas S. v. Comm'r of Soc. Sec.*, No. C21-05213, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022).

## IV.    CONCLUSION

Therefore, at Wilmington this 18th day of March 2024, **IT IS HEREBY ORDERED**

that Plaintiff's motion for summary judgment is **DENIED** (D.I. 17), and the Commissioner's

cross-motion for summary judgment is **GRANTED** (D.I. 25).

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE